E-FILED
Tuesday, 18 August, 2015  11:39:45 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TERMASS A. PLEASANT, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3067 |
| | ) | |
| CAROLY COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant, | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Termass A. Pleasant, Sr., appeals from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Pleasant has filed a Brief in Support of Motion for Summary Judgment (d/e 11) (Pleasant Brief), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 14).  The matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner

should be affirmed in part and reversed and remanded in part, as stated below.

## STATEMENT OF FACTS

Pleasant was born on September 9, 1957.  He has a high school education.  He worked as a laborer on a paint line and an industrial cleaner.  Certified Transcript of Proceedings before the Social Security Administration (d/e 9) (R.), at 38, 41, 69.  Pleasant suffers from a status post CVA (stroke); avascular necrosis in both hips; history of alcohol abuse; obesity, diabetes mellitus with peripheral neuropathy; axonal polyneuropathy; and adjustment disorder with depressed mood.  R. 20. On July 21, 2010, Pleasant filed his claim for Disability Benefits.  Pleasant alleged that he became disabled on March 1, 2009.  R. 17, 150.  He last worked at substantial gainful activity some time before March 1, 2009. See R. 177.

Pleasant's physical complaints began when he suffered a stroke.  On October 13, 2008, Pleasant went to the emergency room complaining of weakness and numbness in his left hand.  The doctors determined that Pleasant had suffered a stroke.  He was admitted to the hospital for treatment.  On October 15, 2008, he was released.  R. 387-88, 404-05.

On October 17, 2008, Pleasant followed up with his primary care physician at the Veteran's Administration (VA), Dr. William P. Hyde, M.D. On examination, Dr. Hyde found that Pleasant had a normal gait and normal muscle tone and strength in the upper and lower extremities. R. 304-06.

On November 12, 2008, Pleasant again saw Dr. Hyde for a follow up examination. Pleasant reported that he had returned to full and normal function. Dr. Hyde advised Pleasant to reduce his drinking of alcohol. At the examination, Pleasant measured 6 feet, 3 inches tall and weighed 315 pounds. R. 297-99.

On February 26, 2009, Pleasant saw Dr. Hyde complaining of a cough side effect from blood pressure medicine. Dr. Hyde changed medicine. Dr. Hyde also advised Pleasant about controlling his blood sugar. R. 292-94.

On April 29, 2009, Pleasant saw Dr. Andrew Denison, M.D., for problems with high blood pressure and high blood sugar. On examination, Dr. Denison found no gross motor or sensory deficits. Dr. Denison prescribed medication and ordered tests. R. 331-32.

On May 27, 2009, Pleasant saw Dr. Denison. Pleasant complained about "some burning and tingling of his lower extremities bilaterally with his

3:14-cv-03067-SEM-TSH   # 16   Page 4 of 30

toes.  This has been present for several months with worsening of his symptoms of recent."  Dr. Denison assessed diabetic neuropathy.  R. 329-30.[1]

On September 16, 2009, Pleasant saw Dr. Denison to have a form completed for the Department of Transportation for a one-year clearance. Dr. Denison noted continued problems with high blood pressure and high blood sugar.  He referred Pleasant to the VA for blood tests.  On September 29, 2009, Pleasant saw Dr. Hyde.  Dr. Hyde renewed Pleasant's medications and advised weight loss.  Dr. Hyde discussed the possibility of prescribing insulin.  Pleasant told Dr. Hyde he wanted to drive a truck and could not be on insulin.  R. 287-90; 325.

On January and February 2010, Pleasant saw Dr. Denison. Pleasant's primary problems were symptoms related to diabetes, high blood pressure, and obesity.  R. 313-18.

On March 1, 2010, Pleasant saw Dr. Jason Sharp, M.D., for problems with his feet.  On examination, Dr. Sharp noted a normal gait; no joint pain or swelling; no back pain; normal strength and muscle tone; and normal movement in all extremities.  Dr. Sharp also noted good coordination and no dizziness or weakness.  Dr. Sharp found diminished sensation in

---

[1] The examination may have been conducted by a medical resident under Dr. Denison's supervision. R. 330.

Pleasant's feet.  Dr. Sharp diagnosed diabetic peripheral neuropathy.

R. 342-44.

On May 3, 2010, Pleasant saw Dr. Sharp for a follow-up examination for his diabetes and high blood pressure.  Pleasant reported symptoms of fatigue and paresthesias in his extremities, but no pain or numbness in his extremities.  On examination, Dr. Sharp noted full range of motion in both feet.  The right foot appeared normal and was not tender.  The left foot appeared normal, but had decreased light touch sensation.  R. 345-46.

On July 13, 2010, Pleasant saw Dr. Sharp.  Pleasant reported worsening fatigue.  Pleasant also reported pain, numbness, and paresthesias in the extremities.  On examination, Pleasants' right foot was tender.  Both feet had diminished tactile sensation. R. 345-48.

On July 21, 2010, Pleasant protectively filed his applications for Disability Benefits.  R. 17.

On September 23, 2010, state agency physician Dr. Sandra Bilinsky, M.D., prepared a Physical Residual Functional Capacity Assessment of Pleasant.  Dr. Bilinsky opined Pleasant could lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight-hour workday; and sit for six hours in an eight-hour workday.  Dr.

Bilinsky opined that Pleasant was not otherwise limited in his functional
capacity.  R. 427-34.

On October 1, 2010, Pleasant saw Dr. Hyde.  Pleasant complained of
being "unsteady sometimes, often going to the left."  R.453. Pleasant
reported that he fell a couple of times.  Dr. Hyde assessed post stroke with
minor but persistent neural deficit.  R. 452-55.

On October 20, 2010, neurologist Dr. James Worrell, M.D., performed
a nerve conduction study.  Dr. Worrell found that Pleasant had axonal
polyneuropathy.  R. 449.

On November 24, 2010, state agency physician Dr. Henry Rohs,
M.D., affirmed Dr. Bilinsky's opinions.  R. 512-15.

On November 19, 2010, state agency psychologist Dr. Patricia Beers,
Ph.D., completed a Psychiatric Review Technique.  R. 498-511.  Dr. Beers
opined that Pleasant's mental impairments were not severe.  R. 498.  Dr.
Beers opined that no evidence indicated that Pleasant's mental
impairments caused any limitations.  R. 498-510.  Dr. Beers concluded,
"Claimant has medical restrictions that leave him unable to work and
provide for his family.  He is depressed due to these facts.  His activities
are primarily limited by his medical condition.  There is no evidence of
current significant limitations related to his mental condition."  R. 510.

On December 1, 2010, Pleasant saw Dr. Hyde for a follow up examination.  Dr. Hyde discussed pain management with Pleasant. R. 530-34.  On March 8, 2011, Pleasant saw Dr. Hyde.  Pleasant told Dr. Hyde that he felt good and was active.  Pleasant complained of numbness in his feet.  R. 519-23.

On June 14, 2011, Pleasant saw Dr. Hyde complaining of pain in his left shoulder, weakness in his left arm, and tingling in his left hand.  On examination, Dr. Hyde found limited range of motion in Pleasant's left shoulder, decreased muscle mass in his left arm and hand, weakened grip strength in the left hand, and decreased sensation in his legs.  Dr. Hyde also noted Pleasant had a normal gait and normal muscle tone and strength.  R. 559-62.  An x-ray of the left shoulder showed arthritis.  R. 623-24.  Dr. Hyde diagnosed likely diabetic amyotrophy of the left arm and hand, or weakness and wasting of the muscles.  Dr. Hyde opined that Pleasant was not able to work.  Dr. Hyde referred Pleasant to a neurologist. R. 561.

On June 15, 2011, Dr. Hyde completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical).  Dr. Hyde opined that Pleasant could lift and carry ten pounds occasionally and less than ten pounds frequently; could stand and/or walk less than two hours in an eight-

hour workday; was limited in his ability to push and pull; could never climb ramps, stairs, ladders, ropes, or scaffolds; could never balance, crouch, crawl, or stoop; could occasionally kneel; could occasionally reach in all directions; and could frequently handle, finger, and feel.  Dr. Hyde further opined that Pleasant should have limited exposure to temperature extremes, vibration, humidity, wetness, and hazards such as machinery and unprotected heights.  R. 540-43.  Dr. Hyde opined that Pleasant's limitations began in October 2009.  R. 540-43.

On August 15, 2011, Pleasant saw neurologist Dr. Decontee M. Jimmeh, M.D.  R. 549-56.  Pleasant was first seen by a medical student under Dr. Jimmeh's supervision, Joseph Carrera.  Carrera found normal muscle tone and reflexes, mild atrophy in Pleasant's left arm and hand, diminished sensation in his legs, feet, and fingers, and difficulty walking on his heels and toes.  R. 552.  Carrera concluded:

> Assessment:  The patients' (sic) symptoms of tingling and numbness as well as burning pain across his lower extremities is consistent with diabetic neuropathy.  The stocking-glove distribution is also consistent with a diabetic neuropathy.  The patients' neuropathy may also be influenced by the patient's alcohol use. The fact that the atrophy is minimal in his left hand and forearm, and that he doesn't report pain in that extremity, it is unlikely that these symptoms of left hand and arm weakness are attributable to diabetic amyotrophy.  Due to the fact that this weakness began with his stroke two years ago, and that he never returned to baseline, it could be that these residual stroke symptoms are being superimposed on an underlying diabetic

neuropathy.  Although either of these causes is reversible, it is important to ensure that his diabetes is well controlled and that his risk factors for stroke are addressed.  Ruling out other reversible causes of his peripheral neuropathy are indicated at this point.  The patient's tingling and burning pain will be addressed with lidocaine patches for his feet.

R. 552.

Dr. Jimmeh then examined Pleasant.  R. 552-56.  With respect to Dr. Hyde's assessment of likely diabetic amyotrophy, Dr. Jimmeh stated, "clinically my suspicion for this condition is low (low pain, insignificant atrophy)."  R. 556.  Dr. Jimmeh ordered an MRI of Pleasant's brain.  The MRI showed no significant stenosis and no acute findings.  R. 618, 620.

On December 1, 2011, Pleasant saw Dr. Hyde.  On examination, Dr. Hyde observed that Pleasant had a normal gait and normal strength in the upper and lower extremities.  R. 585-87.

On February 27, 2012, Pleasant saw Dr. Jimmeh.  Pleasant complained of more left-side weakness.  Pleasant reported falls, loss of muscle mass in his calves, and tingling and numbness in his legs.  On examination, Dr. Jimmeh found normal muscle bulk and tone, normal range of motion in extremities.  Dr. Jimmeh found normal gait, but noted that tandem walking was unsteady.  R. 573-78.

On May 21, 2012, Pleasant saw neurologist Dr. George B. Richerson, M.D., Ph.D.  On examination, Dr. Richerson noted significant muscle

atrophy and twitches in his lower extremities.  Pleasant's range of motion was normal and his gait was normal.  R. 688-92.

On June 20, 2012, Pleasant underwent another nerve conduction study.   The study showed diffuse predominantly axonal sensorimotor polyneuropathy. The results were unchanged from studies conducted in October 2010 and August 2011.  R. 647-48.

On July 27, 2012, Pleasant saw neurologist Dr. William T. Talman, M.D.  On examination, Dr. Talman observed slight motor weakness in his legs, slight atrophy in both calves, and decreased sensation in the legs. Pleasant's gait was normal.  R. 710-15.  A CT scan showed avascular necrosis in both of Pleasant's hips.  R. 711.

On September 25, 2012, Dr. Hyde reaffirmed his June 2011 opinions, as stated above.  This included Dr. Hyde's opinion that Pleasant was not able to work.  Dr. Hyde opined that his opinions were still accurate and applicable.  R. 717-20.

On October 15, 2012, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  Pleasant appeared with his counsel.  Vocational expert Mary Harris also appeared.  Pleasant testified first.  Pleasant testified that he was married with three step-daughters, ages 28, 24, and 10.  He lived with his wife and the three step-daughters.  R. 40.  Pleasant

completed high school and served in the United States Army from 1976 to 1979.  He was honorably discharged.  Pleasant is right-handed.  R. 40-41.

Pleasant testified that he previously worked in a tool and die factory, a levee district, and the highway department.  He lifted objects weighing an average of fifty-five pounds in the factory work.  R. 41-42.  He lifted sand bags for the levee district.  He estimated the bags weighed forty-five pounds.  R. 42.  He drove a truck and patched pot holes in roads.  He estimated a shovel full of patching material weighed forty pounds.  R. 43.  He testified that he stopped working in 2009, except for a brief stint at a Casey's General Store where he only earned a total of $800.00.  R. 38-39.

Pleasant testified about his physical problems.  Pleasant testified that he got dizzy when he bent over.  He also had a tendency to lean to the left with his head.  He testified that he had been leaning to the left since his stroke.  R. 44.  He testified that he could not grip with his left hand and his balance was off.  He testified that he staggered to the left.  R. 44.  He testified that he could not grab, grip, or hold any object with his left hand, including plates, silverware, or a remote control.  R. 45.  He could not lift more than five pounds with his left hand.  He testified that he would "start trembling and drop it."  R. 45.  He testified that he had this condition for "a little bit over two years."  R. 45.

Pleasant testified that he experienced cramps and numbness in both hands and wrists.  R. 45.  He testified that his doctors told him these feelings were caused by his diabetic neuropathy.  R. 45-46.  He described the numbness as "tingles, pins and needles."  R. 46.  Pleasant testified that he had these feelings in his hands and wrists all the time.  R. 46.  Pleasant testified that his left side was a little bit worse than his right.  He testified that both hands became swollen about two times a week.  The swelling lasted about twenty-five seconds.   R. 46.

Pleasant testified that he could only walk half a block before he experienced shortness of breath.  He testified that his doctors told him the shortness of breath was due to his stroke.  R. 47.

Pleasant testified that he had problems in the shower because he leaned to the left.  He used a grab bar in the shower because of this problem.  He also testified that he experienced shortness of breath in the shower when he bent down to wash the lower portions of his body.  R. 48.  Pleasant denied that he smoked either tobacco or marijuana.  R. 48-51.

Pleasant testified that he experienced cramping in his bowels at least three times a week.  The cramps last about fifteen minutes.  He testified that he took thirty minutes thereafter to recover from the effects of the cramping.  R. 52-53.

Pleasant testified that he experienced numbness, tingling and swelling in his ankles and feet similar to the problems he experienced with his hands.  He testified that his feet feel tight like they are ready to explode. He testified that these feelings in his feet were constant.  R. 53-54. Pleasant testified that he had problems walking straight.  He testified that he looked like he was drunk.  R. 54.

Pleasant testified that he had low energy.  He testified that he took a fifteen minute nap around 5:00 or 6:00 pm.  He testified that he had problems remembering dates and appointments since the stroke.  R. 54.

Pleasant testified that he could drive a total of three hours in a day, but not at one time because he had a tendency to doze off.  He testified that he rode in an electric cart to shop in stores.  R. 56.  Pleasant testified that he did not do housework.  He supervised his step-daughters.  He sometimes had problems buttoning buttons with his left hand.  He had to sit down to put on his pants.  He could wash himself in the shower by holding on with his left hand and washing with his right.  R. 57.

Pleasant testified that he regularly slept through only half the night. He went to bed between 9:00 and 10:00 p.m., usually woke up about 2:00 a.m., and lay in bed awake the rest of the night.  R. 57.

In a typical day, Pleasant drove his step-daughters to school and came home and sat in a recliner.  He used a recliner to raise his feet and ankles.  His wife usually prepared supper before she went to work to later be heated in the microwave.   He watched television, read, and spoke on the telephone during the day until his step-daughters returned from school. He then supervised their activities of performing chores, and getting out supper and heating it in the microwave.   Pleasant usually sat in the recliner the rest of the evening after supper.  R. 59.

Pleasant testified that he could stand for fifteen to twenty minutes at a time, for a maximum of thirty minutes in an eight-hour workday; and sit for forty minutes at a time, for a maximum of two hours in an eight-hour workday.  He testified that he needed a recliner to put his feet up if he had to sit for longer periods.  R. 60.  Pleasant testified that he could lift twenty pounds with his right arm.  R. 61.

Pleasant testified that he rode a bike at one point to get some exercise.  He testified that he rode the bike about twenty minutes at a time twice a week.  He testified that he started riding the bike about a year before the hearing and stopped about six months before the hearing. R. 62-63.

Pleasant testified that in 2011, he volunteered about three times a week, for an hour at a time, at the Teen Reach Program in which his step-daughters participated.  R. 63.  Pleasant testified that he sat and helped the children get organized.  R. 64.

Vocation expert Harris then testified.  The ALJ asked Harris this hypothetical question:

> Assume an individual of the claimant's age, education, and work experience who is limited to the full range of light exertional work as defined in the regulations, limited to a sit/stand option defined as allowing the individual to sit or stand alternatively provided the individual is not off task more than 10 percent of the work period, limited to occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds, occasional balancing, stooping, kneeling, crouching, and crawling, such an individual must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights, such an individual is limited to simple, routine, repetitive tasks.  Could such an individual return to any of the past work you testified to?

R. 70-71.  Harris opined that such a person could not perform Pleasant's prior relevant work.  Harris opined that such a person could perform other jobs, such as:  electronics worker, 2,000 available positions in Missouri and 60,000 nationally; small products assembly, 3,000 available positions in Missouri and 100,000 nationally; and hand packager, 3,000 available positions in Missouri and 170,000 nationally.  R. 71.  Harris opined that

these three jobs were a sample of the available jobs that the person in the

hypothetical question could perform.  R. 71.

> The ALJ then asked a second hypothetical question:

> Hypothetical two, assume an individual the claimant's age,
> education and work experience.  We're going to take the first
> hypothetical and we're going to add some restrictions.  We're
> going to add left hand no more than – for handling and fingering
> with the left hand, no more than occasional and for the right
> hand handling and fingering no more than frequent.

R. 72.  Harris opined that the only available job for such a person would be

the electronics worker with the same number of available positions as in

Harris' answer to the first hypothetical question.  R. 72.

The ALJ started to ask Harris to assume a person limited to

sedentary work, but stopped because Medical Vocational Guidelines

provided that such a person would be disabled, even if he could perform a

full range of sedentary work.  R. 73; see Medical Vocational Guidelines

(Grid), 20 C.F.R. Part 404 Subpart P, Appendix 2, Rule 201.14.  The ALJ

then concluded the hearing.

## THE DECISION OF THE ALJ

The ALJ issued his decision on October 26, 2012.  The ALJ followed

the five-step analysis set forth in Social Security Administration Regulations

(Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the

claimant not be currently engaged in substantial gainful activity.  20 C.F.R.

§§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a

severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3

requires a determination of whether the claimant is so severely impaired

that he is disabled regardless of his age, education and work experience.

20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3,

the claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so

severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e).

    If the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience. 20 C.F.R. §§ 404.1520(f),

416.920(f). The analysis at Step 5 starts with the Grid. The Grid divides

individuals into categories based on age, education, work, experience and

RFC. Each category is subject to a separate rule. The Grid includes

categories in which the individuals can perform a full range of work within a

given exertional level, such as a full range of light work or a full range of

medium work.  The rule for each category on the Grid directs a conclusion that individuals who fit into the specific category are either disabled or not disabled.  SSR 83-11.  If the claimant's RFC is limited to less than a full range of work within an exertional level, then the ALJ must consider rules in the Grid and additional evidence, such as testimony from a vocational expert.  See SSR 83-12, 83-14, and 85-15.

The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show at Step 5 that, considering the listed factors, the claimant can perform some type of gainful employment that exists in significant numbers in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Pleasant met his burden at Steps 1 and 2. Pleasant had not engaged in substantial gainful activity since his alleged onset date of March 1, 2009.  Pleasant also had severe impairments of status post CVA; avascular necrosis in both hips; history of alcohol abuse; obesity; diabetes mellitus with peripheral neuropathy; axonal polyneuropathy; and adjustment disorder with depressed mood.  R. 19-20.

The ALJ found at Step 3 that Pleasant's impairments or combination of impairments meets or equals a Listing.  R. 21.

At Step 4, the ALJ found that Pleasant had the RFC to perform light work subject to the following additional limitations:  a sit/stand option that allows sitting or standing alternately, provided that Pleasant is not off task more than ten percent of the work period; only occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; only occasional balancing, stooping, crouching, kneeling, and crawling; and no exposure to hazards such as operational control of moving machinery and unprotected heights; and can only perform routine repetitive tasks.  R. 22.

The ALJ relied on the medical examinations in 2010 and 2011 that stated that Pleasant had full range of motion, no swelling, normal strength and a normal gait.  R. 23-24.  The ALJ found Pleasant's testimony was not credible in light of the medical record.  The ALJ discounted Dr. Hyde's June 15, 2011 opinions as being inconsistent with his examination notes.  The ALJ also relied on Dr. Jimmeh's statement that Dr. Hyde's finding of diabetic amyotrophy was clinically suspicious due to insignificant muscle atrophy.  R. 25-26.  The ALJ added the sit/stand option to give some credit to Pleasant's testimony about a limitation on his ability to stand.  R. 25-26.

The ALJ found at Step 4 that Pleasant could not perform his prior relevant work.  The ALJ relied on the fact that all of his prior work was at the medium or heavy exertional level.  R. 26.

The ALJ found at Step 5 that the Commissioner met his burden for the period prior to Pleasant's 55th birthday, September 9, 2012.  Before that date, the applicable rule from the Grid stated that Pleasant was not disabled if he could perform the full range of light work.  Grid, Rule 202.14. Harris' testimony established that even with Pleasant's limited RFC, he could still perform a significant number of jobs that exist in the national economy.  R. 26.

Upon reaching the age of 55, however, Pleasant was governed by a different rule on the Grid.  After Pleasant reached 55 years of age, the applicable rule on the Grid directed the conclusion that Pleasant was disabled even if he could perform a full range of all light work.  Grid, Rule 202.06; R. 27.  The ALJ, therefore, found that Pleasant became disabled on September 8, 2012, but not before.  R. 27-28.

Pleasant appealed.  On January 16, 2014, the Appeals Council denied Pleasant's request for review.  The ALJ's decision then became the final decision of the Commissioner.  R. 1.  Pleasant then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision found that the Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible because they were inconsistent with the RFC assessment of the ALJ. (R. 23) In reaching this conclusion, the ALJ afforded little weight to the opinion of Dr. Hyde, Claimant's primary treating VA staff physician.

Dr. Hyde prepared an MSS on June 15, 2011.  (R. 540-543)  As set forth

above, Claimant had been treated by Dr. Hyde repeatedly beginning in

2008  (R. 304-306)  through September 25, 2012 (R. 717-20).  In the MSS

prepared by Dr. Hyde in June of 2011 (TR. 540-543), Dr. Hyde determined

that Claimant's limitations prevented him from working.  This opinion was

updated in September of 2012  (R. 716-720).  Dr. Hyde's reasoning for

Claimant's disability was as follows:

> This man suffers diabetic amyotrophy in left hand and arm with
> weakness and muscle atrophy.  His legs are affected by
> diabetic sensory neuropathy with pain decreased feeling and
> finally he has suffered a cerebellar stroke that adds to his
> imbalance and unsteadiness.  Additionally he has pain and
> decreased motion left shoulder due to arthritis of the shoulder.
> (TR. 540-543)

This is the opinion which was reaffirmed in September of 2012.  (R. 716-

720)

Determining the weight to give any medical source, the regulations

require the ALJ to consider the following:

> (1) the "[l]ength of the treatment relationship and the frequency
> of examination," because the longer a treating physician has
> seen a claimant, and particularly if the treating physician has
> seen the claimant "long enough to have obtained a longitudinal
> picture" of the impairment, the more weight his opinion
> deserves;  (2) the "[n]ature and extent of the treatment
> relationship";  (3) "[s]upportability," i.e., whether a physician's
> opinion is supported by relevant evidence, such "medical signs
> and laboratory findings";  (4) consistency "with the record as a

whole";  and, (5) whether the treating physician was a specialist in the relevant area.  20 C.F.R. § 404.1527(c)(2)-(5).

<u>Scrogham v. Colvin</u>, 765 F.3d 685, 696-698 (7th Cir. 2014)

The primary reason the ALJ gave little weight to the opinion of Dr. Hyde is the neurology report of Dr. Jimmeh, staff neurology physician, which stated as follows:   "? diabetic amyotrophy-clinically my suspicion for this condition is low (low pain; significant atrophy)"   (R. 556)   Dr. Jimmeh did not reject the diagnosis.  He only questioned it.  The ALJ either failed to consider other evidence or explain or discount the significance of other evidence regarding these findings.  For instance, the ALJ did not mention the neurology report of Drs. Malik and Richerson, which indicated the Claimant has significant muscle atrophy and fasic in the examination given to the Claimant on May 12, 2012.  That examination noted that Claimant was presumed to suffer from diabetic polyneuropathy (R. 688-692).

While the ALJ indicates that Dr. Hyde's opinions are inconsistent with the Claimant's own report of good activities, the ALJ failed to specify what activities he relied upon.

Likewise, the ALJ failed to address the prior neurological finding that the Claimant exhibited axonal polyneuropathy on October 20, 2010. (R. 449)

In <u>Scrogham v. Colvin</u>, Id., the Seventh Circuit criticized the ALJ for not giving controlling weight to the treating physician's report because the report was "inconsistent with the weight of the objective medical evidence" without explaining the decision enough to evaluate the other treatment records of the treating physician as well as other physicians.  The Seventh Circuit noted that the failure to consider the factors from 20 C.F.R. § 404.1527 set forth above and failure to articulate reasons for not considering other doctor's opinions foreclosed a meaningful review of the decision of the ALJ.  The Court likewise noted that the ALJ failed to explain why events that did not occur contemporaneously with the report of the treating physician conflict with the treating physician's report.  <u>Id</u> at 696-698.

Failure of the ALJ to articulate, as required by the above cited regulations, the reasons for the discounting and giving little weight to the opinion of Dr. Hyde is sufficient to warrant remand of the case in order to have the ALJ state the reasons for the discounting of Dr. Hyde's opinion in order to permit meaningful review of the determination that the Claimant was not disabled in the time period between October 2009 (the date Dr. Hyde believed the Claimant's disability began) and September 8, 2012 (the

date when the ALJ determined Claimant was eligible for disability benefits

due to his age).

In doing so, the ALJ should reconsider the evidence in support of the

RFC determination.  In making a determination of the residual functional

capacity, the ALJ noted as follows:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment.  (R. 23)

The Seventh Circuit has soundly criticized the use of this "template"

language as "meaningless boilerplate".  Bjornson v. Astrue, 671 F.3d 640,

644-645 (7th Cir. 2012) .  The Court in Bjornson noted that a statement by a

trier of fact that a witness testimony is "not entirely credible" yields no clue

as to what weight the trier of fact gave the testimony.  Id.  The statement

fails to link the conclusory statements contained in the ALJ's opinion to

evidence in the record or to the facts at hand.  For instance, the ALJ

indicated relatively good physical exam results by referring to the physical

examination of March 2010 which revealed "normal gait, no joint swelling,

normal movements of all extremities, no joint instability and normal muscle

strength and tone".  (R. 23)   The ALJ also indicated that a neurological

exam revealed "upper and lower extremity motor exams were normal, as was gait". (R. 24) On the same page, in support of the ALJ's statement that physical exams show good functional abilities in 2011, the ALJ again states that the record reviewed "the claimant's gait was normal and muscle tone and strength and upper lower extremities was normal".

In support of the conclusion that the Claimant "remained quite active", the ALJ states ". . . he recently traveled to Atlanta, Georgia for several days to visit his oldest daughter and granddaughter. While in Atlanta, he visited and socialized with family, did some sightseeing, attended several sporting events." (R. 24) The ALJ cites to a psychiatry note in which the Claimant reported on October 18, 2011, that he had traveled to Atlanta, Georgia for several days to visit his oldest daughter and her child. He was accompanied by his wife and daughter. The report indicated while he was there they were able to visit family members, do some sightseeing, and attend events such as the fall festival and the women's pro basketball game and the Martin Luther King memorial. Claimant stated that these activities allowed him to stop dwelling on his problems. (R. 590) During his testimony, the Claimant indicated that he could go shopping only if the place he shopped had little electric riding carts. The Claimant indicated he had been doing that since 2009. (R. 56) However, the ALJ indicated that

the Claimant had traveled and engaged in considerable walking "while sightseeing". (R. 25) There is no indication, in light of the testimony, how the ALJ came to the conclusion that the Claimant was walking while sightseeing.

In finding that the Claimant's statements concerning his limitations are inconsistent with his own report of "good activities" (R. 26) with the "objective" evidence from physical exams (R. 24), the ALJ apparently depended on his review of the evidence as summarized in the decision. (R. 24-26) For instance, the ALJ indicated the Claimant was considering volunteer work and said that he thought he could do it about three times per week. (Testimony) (R. 23) The testimony, however, indicates that the Claimant was volunteering in 2011. He indicated in that time he would help about three times per week for an hour. In doing that volunteer work he was sitting down the entire time helping to get kids organized. (R. 63-64) Sitting for three hours a week working with children does not indicate an ability to work an eight-hour day.

Additionally, the ALJ does not appear to have recognized that the condition of the Claimant may have worsened over time. For instance, the ALJ noted that the Claimant reported that "he enjoys the ability to cook". (R. 25) This conclusion is apparently based upon a statement made by the

Claimant that he did cooking.  (R. 438)  That statement appears in a

psychiatry consult on October 26, 2010.  The testimony of the Claimant at

the hearing before the ALJ indicates his wife made meals and he instructed

his step-daughters how to heat the pre-cooked meals in a microwave.

(R. 59)  The statement relied upon by the ALJ was approximately two years

prior to the testimony of the Claimant at the hearing.

　　　A Social Security Administrative Law Judge cannot completely

discount testimony that can't be attributed to objective injuries or illnesses –

the kind of injuries and illnesses revealed by x-rays.  Adaire v. Colvin, 778

F.3d 685 (7th Cir. 2015).   The Court in Adaire noted that Social Security's

own regulations state:  "an individual's statements about the intensity and

persistence of pain or other symptoms or about the effect the symptoms

have on his or her ability to work may not be disregarded solely because

they are not substantiated by objective medical evidence."  SSR 96-7p(4).

Id.  Here the ALJ appears to completely credit the medical reports using

generic language relating to gait and normal muscle tone without

consideration of the Claimant's description of his symptoms.  For instance,

the Claimant testified he had not been able to grab, grip, or hold any object

in his left hand, including plates, silverware, or a remote control, for a little

bit over two years.  (R. 44-45)  Additionally, the Claimant indicated both hands hurt all the time and sometimes will be numb.  (R. 45-46)

Pleasant argues that the ALJ treated the opinion of psychologist Dr. Beers inconsistently.  Dr. Beers opined that Pleasant did not have a severe mental impairment.  R. 498.  The ALJ gave this opinion great weight.  R. 25.  Pleasant does not appeal this aspect of the ALJ's opinions.  Dr. Beers also commented, "Claimant has medical restrictions that leave him unable to work and provide for his family.  He is depressed due to these facts.  His activities are primarily limited by his medical condition."  R. 510.  Pleasant argues that the ALJ inconsistently gave weight to only part of Dr. Beers' opinions and should have credited Dr. Beers' statement that Pleasant was unable to work due to medical restrictions.  The Court sees no error.  Dr. Beers is a psychologist.  She was qualified to render opinions about Pleasant's mental condition, not his physical condition.  The ALJ could properly disregard the comments of Dr. Beers about Pleasant's physical condition.

Consistent with the opinions set forth above, the ALJ should re-evaluate his residual functional capacity analysis concerning the weight given to the opinion of treating physician Dr. Hyde with regard to the criteria set forth in 20 C.F.R. § 404.157(c)(2)-(5) and articulate his specific reasons

indicating why the Claimant's testimony concerning the intensity, persistence, and the limiting effects of his symptoms are not credible.

THEREFORE, THIS COURT RECOMMENDS that Pleasant's Brief in Support of Motion for Summary Judgment (d/e 11) should be ALLOWED IN PART, Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 14) should be DENIED, and that pursuant to Sentence Four of 42 U.S.C. § 405g, the decision of the ALJ should be REVERSED and Plaintiff's case should be REMANDED to the ALJ for a re-hearing.  As no appeal was taken from the decision of the ALJ that the Claimant became disabled on September 8, 2012, that decision is AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   August 18, 2015

      *s/ Tom Schanzle-Haskins*      
UNITED STATES MAGISTRATE JUDGE